## GARFIELD *v.* UNITED STATES EX REL. LOWE.

INDIANS; TREATIES.

1. Sec. 3 of the act of Congress of April 26, 1906 (34 Stat. at L. 137, chap. 1876), declaring what persons shall be eligible for enrolment as Cherokee citizens, constituted a legislative interpretation of, and superseded *pro tanto*, article 9 of the Cherokee treaty of August 11, 1866 (14 Stat. at L. 799), defining such citizenship.

2. The Secretary of the Interior, after due notice to the parties interested and a hearing, had authority to reverse his action in enrolling the names of persons claiming to be members of the Cherokee Nation, and to cancel allotment certificates issued to them, where such action was taken before the expiration of the time fixed by Congress for the completion of the rolls. (Construing art. 9 of the Cherokee treaty of August 11, 1866, 14 Stat. at L. 799; act of Congress of July 1, 1902, sec. 29, 32 Stat. at L. 716, chap. 1375; act of Congress of April 26, 1906, par. 2, sec. 3, 34 Stat. at L. 137, chap. 1876, and distinguishing *Garfield* v. *United States*, 30 App. D. C. 177, s. c. 211 U. S. 249, 53 L. ed. 168, 29 Sup. Ct. Rep. 62.)

No. 1913.  Submitted March 2, 1909.  Decided November 30, 1909.

HEARING on an appeal by the respondent, the Secretary of the Interior, from an order of the Supreme Court of the District of Columbia, directing the issuance of the writ of mandamus.
     *Reversed.*

The COURT in the opinion stated the facts as follows:

This is an appeal by the Secretary of the Interior from an order of the supreme court of the District, directing the issu-

ance of a writ of mandamus commanding the Secretary "to restore the names of the relators to the freedmen rolls of members or citizens of the Cherokee Tribe or Nation, to erase from said rolls the statements placed thereon derogatory to relators' rights in said Cherokee Tribe or Nation, and to recognize relators as enrolled freedmen members of said tribe or nation." The relators, Lillie Lowe, Ransom Lowe, Bertha Lowe, Evalina Lowe, Mary Robbins, Albert Rogers, and Dollie Jones, heirs at law of Sherman Jones, deceased, under a stipulation or agreement with the respondent, brought their action collectively instead of individually, to save a multiplicity of suits. While the cause was pending Secretary Garfield retired, and his successor was made party respondent in his stead.

The relators claim to be Cherokee freedmen by blood and by descent from former recognized slaves of the Cherokees, prior to and at the commencement of the Civil War, except that Dollie Jones claims to be the heir at law of Sherman Jones, deceased, who, it is claimed, was a descendant of the former Cherokee freedman. They aver that prior to November 16th, 1904, the Secretary of the Interior confirmed a decision by the Commission to the Five Civilized Tribes, holding that relators, except William J. Lowe and James H. Lowe, designated in the petition as "new borns," were entitled to enrolment as freedmen citizens of said Cherokee Tribe or Nation; that after a full and careful inquiry into the rights of relators and the record in the case, the names of relators, except said William J. and James H. Lowe, were, prior to November 16th, 1904, duly and regularly ordered placed on the final roll of freedmen citizens of said Cherokee Tribe or Nation; that thereafter the final roll of freedmen citizens of said Nation containing the names of relators, as such citizens, was duly and regularly approved by the lawful incumbent of the office of Secretary of the Interior, and the names of relators were duly entered, and placed on the regularly authenticated and approved final rolls of freedmen citizens of said Nation; that, prior to the time when the names of relators were struck from said final rolls of said freedmen citizens of said Nation, the relators, except said William J. and·

James H. Lowe, duly and regularly selected an allotment of 110 acres each of average allotable lands of the Cherokee Nation, and, after the names of relators had been duly and regularly placed on the final approved rolls of freedmen citizens of the Cherokee Nation allotment, certificates were duly and regularly issued to relators for the lands so selected by them by the Commission to the Five Civilized Tribes, and are now held by them as conclusive evidence of their right to the lands so selected by them, and described in the allotment certificates aforesaid; that after the issuance to relators of said allotment certificates the Secretary of the Interior arbitrarily and illegally undertook to deprive relators of the rights vested in them by law, and without lawful right or power so to do struck, or attempted to strike, their names from said approved final rolls of Cherokee freedmen.

The relators also aver that their ancestors, as a matter of fact, returned to and were within the Cherokee Nation on and prior to February 11th, 1867, and further aver that they were not required to have so returned by any treaty or other law, their ancestors having been Cherokee slaves at the outbreak of the Civil War; that the cancelation of the names of relators was thus illegally and arbitrarily ordered, because of an erroneous construction of the law.

To this petition the Secretary responded, admitting that relators were descended from former Cherokee slaves, but denying that they or any of them were citizens or member of said Cherokee Nation. The answer also admitted "that on November 16th, 1904, the Acting Secretary of the Interior approved a partial list of freedmen members of the Cherokee Nation, which contained the names of Mary Robbins, Sherman Jones, Albert Rogers, Lillie Lowe, Ransom Lowe, Evalina Lowe, and Bertha Lowe, said persons having been adjudged by the Commission to the Five Civilized Tribes, upon applications duly made by them or on their behalf, to be entitled to be enrolled as freedmen members of the Cherokee Nation, said commission having found upon the hearing had upon such applications that the principal applicant, Mary Robbins, through whom the others claimed to be

entitled to be enrolled, was the slave of a Cherokee citizen at the commencement of the Rebellion, but returned to the Cherokee Nation within the time specified in the decree of the court of claims rendered on January 27, 1896, in the case of *Whitmire* v. *Cherokee Nation,* 31 Ct. Cl. 140, for the return of freedmen to said Nation."

The answer further admitted that thereafter, and within the time fixed by the act of Congress of April 26th, 1906 (34 Stat. at L. 137, chap. 1876), for the completion of the rolls of the Five Civilized Tribes, his predecessor disapproved the enrolment of said citizens, and struck their names from said partial list. It was also admitted that after said approval, by the Acting Secretary of the Interior, of said partial list containing the above names of relators, allotment certificates were issued to them, for lands selected by them as their allotments, but the answer averred that thereafter said allotment certificates were canceled, and other persons allowed to file on certain of said lands, and that no patents were ever issued or recorded for said lands; that after said approval, by the Acting Secretary of the Interior, of said partial list of freedmen members of the Cherokee Nation, and on June 30th, 1905, said commission rendered its decision upon the application for the enrolment as Cherokee freedmen of one James Rogers, who was shown by the evidence submitted to be a son of Mary Robbins, or Mary Rogers, whose enrolment had been approved as aforesaid; that the right of said James Rogers to be enrolled depended upon whether his mother, Mary Robbins, or Mary Rogers, had returned to the Cherokee Nation within the time specified by the decree of the court of claims rendered February 3d, 1906; that said commission found that said Mary Robbins, or Mary Rogers, did not return to and establish her residence in said nation within the time specified in said decree and, therefore, denied the application; that subsequently, on July 19th, 1906, the Secretary of the Interior, by the Assistant Secretary, set aside said decision of said commission denying the application of said James Rogers and directed a rehearing therein, and in the same order directed the Commissioner to the Five Civilized Tribes to re-

hear and readjudicate the application for enrolment, of the re-
lators, and to consolidate all said applications on said rehearing
and readjudication; that thereafter, and within the time fixed
by law for the completion of the rolls of said Five Civilized
Tribes, a rehearing of said consolidated applications was had,
after due notice to all the parties concerned, at which rehear-
ing they appeared either in person or by counsel, or both, and
that upon said hearing the Commission to the Five Civilized
Tribes rendered a decision dated December 3d, 1906, holding
that the evidence submitted showed that the principal applicant,
Mary Robbins, "was the slave of a Cherokee citizen at the com-
mencement of the War of the Rebellion; that during the
progress of said Rebellion she left the Cherokee Nation and
did not return thereto and establish an absolute bona fide
residence in the Cherokee Nation within the time specified
in the decree of the court of claims rendered January 27, 1896,
in the case of *Whitmire* v. *Cherokee Nation,* 31 Ct. Cl. 140, as
provided by par. 2 of sec. 3 of the act of Congress, approved
April 26th, 1906 (34 Stat. at L. 137, chap. 1876), for the return
of freedmen to said Nation. Said commissioner further found
that the evidence showed that all the other applicants were de-
scendants of said Mary Robbins, born since 1866, and neither
claimed nor possessed any rights to enrolment as Cherokee
freedmen other than as such descendants, and that, excepting the
Kern-Clifton roll, none of the applicants could be identified on
any roll of the Cherokee Nation in the possession of his office;"
that said commissioner adjudged said applicants not entitled
to enrolment as Cherokee freedmen, and severally denied their
applications; that thereafter on March 4th, 1907, the Acting
Secretary of the Interior confirmed said decision, and thereby
canceled the names of said persons from said partial lists, ap-
proved as aforesaid; that in reopening and readjudicating said
cases the Secretary proceeded in accordance with a long-estab-
lished and well-recognized practice of the Department, extend-
ing from July, 1902, until the close of March 4th, 1907. The
answer further states that William J. Lowe and James H.
Lowe, who claim to be entitled to enrolment as "new borns" un-

der the act of Congress of April 26th, 1906 (34 Stat. at L. 137, chap. 1876), were never enrolled, but that their applications were severally denied.

To this answer a demurrer was filed, which was sustained by the court, and, the respondent electing to stand upon his demurrer, the writ of mandamus was ordered to issue.

*Mr. George W. Woodruff,* Assistant Attorney General, *Mr. Daniel W. Baker,* United States Attorney for the District of Columbia, *Mr. Stuart McNamara,* Assistant United States Attorney, *Mr. F. W. Clements,* First Assistant Attorney Interior Department, and *Mr. C. Edward Wright,* Assistant Attorney Interior Department, for the appellant.

*Messrs. Kappler & Merillat* for the appellees.

Mr. Justice ROBB delivered the opinion of the Court:

Counsel for the petitioners, in the hearing at bar, abandoned their contention as to the so-called "new borns;" hence they may be dismissed from further consideration.

The several assignments of error are all embraced in the general proposition whether the authority of the Secretary was exhausted as to any enrolment when once exercised. If it was not exhausted, and he had a right to rehear and readjudicate the applications of these relators, his decision will not be disturbed unless it appears that he has misinterpreted the plain and unambiguous provisions of the statute. On the other hand, if, in the absence of a showing of fraud, he was without authority to deprive petitioners of rights which had inured by reason of his prior adjudications, it follows that they are entitled to the remedy sought. *Garfield v. United States,* 211 U. S. 249, 53 L. ed. 168, 29 Sup. Ct. Rep. 62.

The right of relators to enrolment as citizens of the Cherokee Nation was dependent on the interpretation by the Secretary of article 9 of the Cherokee treaty of August 11th, 1866 (14 Stat. at L. 799), the material part of which is as follows: "They

[Cherokee Nation] further agree that all freedmen who have been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the Rebellion, and are now resident therein, or who may return within six months, and their descendants, shall have all the rights of native Cherokees."

The relators were enrolled upon the understanding that their ancestor, Mary Rogers, returned to the Cherokee Nation within six months from August 11th, 1866. The rehearing resulted in the finding that she did not return within that time, and, therefore, that relators were not entitled to enrolment.

Subsequent to the enrolment of relators, and prior to the cancelation of such enrolment by the Secretary, the act of April 26th, 1906, entitled, "An Act to Provide for the Final Disposition of the Affairs of the Five Civilized Tribes in the Indian Territory, and for Other Purposes," was passed. In that act it is provided that "the roll of Cherokee freedmen shall include only such other persons of African descent, either free colored or the slaves of Cherokee citizens and their descendants, who were actual, personal, bona fide residents of the Cherokee Nation August 11th, 1866, or who actually returned and established such residence in the Cherokee Nation on or before February 11th, 1867; but this provision shall not prevent the enrolment of any person who has heretofore made application to the Commission to the Five Civilized Tribes, or its successor, and has been adjudged entitled to enrolment by the Secretary of the Interior." (34 Stat. at L. 137, chap. 1876, par. 2, sec. 3.)

If any doubt theretofore existed as to the proper construction to be given article 9 of said treaty of August 11th, 1866, that doubt was dissipated by the language of sec. 3 of the above act of April 26th, 1906, for that language constitutes a legislative interpretation of, and supersedes *pro tanto,* the prior treaty. *Cherokee Tobacco (Boudinot* v. *United States)* 11 Wall. 616, 20 L. ed. 227. In other words, we think that, under the true construction of the language of said treaty of August 11th, 1866, the benefits of citizenship were conferred only upon free colored persons, or the slaves of Cherokee citizens and their descend-

ants, who were actual bona fide residents of the Cherokee Nation August 11th, 1866, or who actually returned and established such residence in the Cherokee Nation within six months from that time.

It is contended by appellees that this case is governed by the decision in *Garfield* v. *United States,* 211 U. S. 249, 53 L. ed. 168, 29 Sup. Ct. Rep. 62, s. c. 30 App. D. C. 177, but there is a fundamental difference between the two cases. Goldsby had been found by the Dawes Commission to be entitled to enrolment, and the Secretary of the Interior had approved the final roll upon which Goldsby's name appeared. Thereupon the Secretary, *without notice* to Goldsby, struck his name from the roll. The Supreme Court affirmed the decision of this court, that the Secretary had no power or authority "without notice or hearing to strike down the rights thus acquired." Nowhere in the opinion of the Supreme Court is it intimated that the Secretary is without authority, after notice or hearing, to correct a manifest error in making up such a roll.

Sec. 29 of the act of July 1st, 1902 (32 Stat. at L. 716, chap. 1375), provides: "For the purpose of expediting the enrolment of the Cherokee citizens, and the allotment of lands as herein provided, the said commission shall, from time to time, and as soon as practicable, forward to the Secretary of the Interior lists, upon which shall be placed the names of those persons found by the commission to be entitled to enrolment. The lists thus prepared, when approved by the Secretary of the Interior, shall constitute a part and parcel of the final roll of citizens of the Cherokee Tribe, upon which allotment of lands and distribution of other tribal property shall be made. When there shall have been submitted to and approved by the Secretary of the Interior lists embracing the names of all those lawfully entitled to enrolment, the roll shall be deemed complete. The roll so prepared shall be made in quadruplicate, one to be deposited with the Secretary of the Interior, one with the Commissioner of Indian Affairs, one with the principal chief of the Cherokee Nation, and one to remain with the Commission to the Five Civilized Tribes."

It will be observed that this section "for the purpose of expediting the enrolment of Cherokee citizens and the allotment of lands" therein provides that partial lists shall be forwarded to the Secretary, and that when these partial lists shall have been by him approved they shall constitute a part of the final roll of citizens of the Cherokee Tribe. This provision enabled the commission to forward the result of its investigations, as the work progressed, to the Secretary for his review and approval. In other words, the provision enabled the commission to forward its findings in instalments. It is, we think, quite clear that Congress did not contemplate that the roll should be deemed complete, and beyond the control of the Secretary, until lists embracing the names of all those lawfully entitled to enrolment had been submitted to and passed upon by him. Until the roll was complete we think it was the intention of Congress that he should have jurisdiction and control over every part of it. It is unreasonable to suppose that Congress, in merely providing that the commission might, from time to time, forward to the Secretary lists containing the names of those thought to be entitled to enrolment, intended to deprive the Secretary, after he had once acted upon a given application, of further authority over it. Rather do we think that the Secretary's authority continued until the entire roll was complete. The construction urged by appellees is so literal and narrow that, in our view, it does violence to the import and general purpose of the act. Having in mind that the duties of the Secretary in the premises were quasi judicial, and considering the object of the provision for the submitting in instalments, to the Secretary, of the work of the commission, we rule that the Secretary had the same power over the roll, until terminated by statutory limitations, that a court has over its judgments.

After its first adjudication the commission discovered new evidence indicating that relators were not entitled to enrolment. Upon this evidence being brought to the attention of the Secreary, a rehearing was directed. Due notice was given, and a rehearing, in which the relators participated, was had. This rehearing resulted in the setting aside of the prior adjudication,

and the striking of the relators' names from the rolls. There is no contention that every requirement of due process of law was not observed. We therefore rule that the Secretary's authority as to these enrolments was not exhausted when he acted upon the record first submitted to him, and that he had power to correct the error discovered.

It is next contended that, even conceding that prior to said act of April 26th, 1906, the Secretary possessed authority or jurisdiction over partial enrolments theretofore made by him, that act deprived him of such authority. The particular language relied upon is found in said sec. 3, and is as follows: "But this provision shall not prevent the enrolment of any person who has heretofore made application to the Commission to the Five Civilized Tribes, or its successor, and has been adjudged entitled to enrolment by the Secretary of the Interior."

The question is therefore presented whether the words "and has been adjudged entitled to enrolment by the Secretary of the Interior" refer to the original and, as we have held, preliminary adjudication of the Secretary, or whether they were merely intended to set at rest the claims of those whose names should appear upon the final roll. We incline to the latter view. Surely Congress did not intend to bestow the right of enrolment upon those who had been fortunate enough to have their applications preliminarily passed upon by the Secretary, prior to the passage of this act, and deprive others of the same class of that right, simply because the commission had not then forwarded the names of such applicants to the Secretary. It is more reasonable to suppose that Congress intended to do no more than to prevent inquiry, based upon the status of the ancestor of the claimant, subsequent to the approval of the final roll. Any other view would result in injustice.

The decree must be reversed with costs, and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*